SUPERIOR COURT 
 
 COMMONWEALTH v. KAMAL OLIVER

 
 Docket:
 2284CR00555
 
 
 Dates:
 April 29, 2024
 
 
 Present:
 William F. Bloomer Justice of the Superior Court
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION (Paper No. 65)
 
 

             The defendant, Kamal Oliver ("Oliver"), moves to suppress a single-photo identification of him by a civilian witness, Amiyah Chaney ("Chancy"), on August 24, 2022, during an investigation into the shooting death of Xavier I3arkon ("Barkon" or the " victim") twelve days earlier. Following a hearing, and for the reasons set forth below, Oliver's motion to suppress is
DENIED.
FINDINGS  OF FACT
            On April 9 and April 22, 2024, the court heard testimony from Chaney and Boston Police Department ("I3PD") Detective Robert Zingg ("Zingg") and received three exhibits in evidence. Oliver did not testify. The court makes the following factual findings based on the credible evidence produced at the hearing and the reasonable inferences drawn from the evidence. In making these findings, the court finds the testimony of Chaney and Zingg truthful and accurate on the relevant and material points set forth below.
            Zingg has been a I3PD officer for approximately 33 years. He has been a detective since 1998 and assigned to BPD's Homicide Unit the last twelve years. Chaney was 18 years old at the time of the incident. She was a self-taught hair stylist who cut hair at her home on a part-
 
                                                            -1-
 
time basis. J\t the time of the shooting, Chancy had three regular clients, one of whom was Oliver. Chaney knew Oliver to go by the name " Maly." Chancy also developed a personal relationship with Maly.
            On August 11 , 2022, Boston Police responded to a report of a person having been shot inside a motor vehicle parked on Oak Hill Avenue, a dead-end street in Mattapan. When police arrived at the scene, they observed that the victim, Barkon, had suffered a gunshot wound to the chest. Barkon was transported to a hospital but succumbed to his injuries the next day.
            During their investigation, detectives from the Homicide Unit, including Zingg, learned two cars were present on Oak Hill J\venue at the time of the shooting. Seated in one vehicle, blue in color, were the victim, who was the front scat passenger, and the victim's cousin, Jahmari Howard, who was the driver of the vehicle. Seated in another vehicle, a red Honda "Zip" car, were the victim's other cousin, Travin Parrara, who was the front scat passenger, and Chancy, who sat in the rear passenger compartment of the Zip car. Chancy and Travin intended to smoke marijuana. "Maly" stood outside the vehicles engaged in a heated argument with the victim.
During this argument, Chancy scrolled through Facebook on her cellphone. As she did so, she heard a gunshot. Both Chancy and Parran1 exited and ran from the red Zip car to residences on Oak Hill Avenue. As she ran to her home, Chancy observed that the victim had been shot. She neither saw Maly shoot Barkon nor did she sec Maly in possession of a firearm. By the time officers arrived, the red Zip car had left the scene.
            Zingg attempted to interview Chaney telephonically shortly after the shooting, but she left the phone off the hook and ignored him for approximately twelve minutes before hanging up on Zingg. During their investigation, Zingg and other investigators received information that the person responsible for the shooting went by the name Maly, and that this person had a Facebook
 
                                                            -2-
 
account with the username "Maly Boutabag." The prosecution subpoenaed Chancy to appear, and she did appear, before the grand jury on August 24, 2022. Sec Exhibit ("Ex.") 3 (transcript of Chaney's testimony before the grand jury). Before giving testimony, Chancy was interviewed by Zingg, BPD Sergeant Detective Scan Doherty, and the assistant district attorney. As described in greater detail below, Chaney had cut and braided Maly' s hair nearly every other week for one to two years before the shooting, and the two became friends.  During the interview, Zingg showed a single photograph of the defendant to Chancy, who confirmed that the individual depicted in the photo was "Maly." See Ex. 2. She signed and dated the photograph. The photograph depicted Oliver. During her testimony before the grand jury, Chancy again confirmed that the person depicted in the photograph was Maly. Ex. 3 at *38.[1]
            Additional factual findings are integrated in the following conclusions of law.
CONCLUSIONS  OF LAW
            Admission into evidence of an identification that was the product of an unnecessarily suggestive procedure violates a defendant's right to due process guaranteed by the Fourteenth Amendment to the United States Constitution and Article 12 of the Massachusetts Declaration of Rights. Sec generally Commonwealth v. German, 483 Mass. 553, 557-558 (2019).[2] "To succeed in suppressing evidence of such an identification, however, the defendant must prove by a preponderance of the evidence that the police procedure was ' so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny [the defendant] due process of la w." ' Commonwealth v. Dew, 478 Mass. 304, 306-307 (2017).
 
--------------------------------------------
 
[1] Chancy also identified Oliver during the evidentiary hearing on April 22, 2024.
[2] Because the standard for admissibility of an identification under the Massachusetts Constitution is more favorable to a defendant than the standard under the United States Constitution, this court need not consider any federal constitutional claims. Commonwealth v. Galipeau, 93 Mass. App. Ct. 225, 227 n.3 (2018).
 
                                                            -3-
 
            "For constitutional purposes, a one-photograph identification is the equivalent of an in- person, one-on-one identification (often referred to as a 'showup')." Commonwealth v. Carlson, 92 Mass. App. Ct. 710 , 712(2018). Sec also Commonwealth v. Forte, 469 Mass. 469, 477 (2014). One-on-one identification procedures arc generally disfavored as inherently suggestive. Dew, 478 Mass. at 306. Suggestiveness alone, however, is not sufficient to render a one-on-one identification inadmissible in evidence. German, 483 Mass. at 557. Sec Commonwealth v. Silva-Santiago, 453 Mass. 782, 797 (2009) (while disfavored , one-on-one showup identifications, whether in-person or photographic, may be admissible even though they are inherently suggestive).
            "In general, a defendant may challenge a showup identification as unnecessarily suggestive in two ways. First, a defendant may attempt to show that the police did not have a good reason to conduct this type of disfavored, inherently suggestive, one-on-one identification procedure ... Second, a showup identification is unnecessarily suggestive if the procedure utilized by the police includes ' special elements of unfairness. " ' German, 483 Mass. at 558.
            Oliver initially argues that the single-photographic identifications of him by Chancy before and during her grand jury testimony were without good cause and any pre-instruction warnings and, therefore, unnecessarily suggestive and conducive to irreparable mistaken identification. " ' In assessing the suggestiveness of an identification , [courts] consider " whether good reason exists for the police to use a one-on-one identification procedure."" ' Carlson, 92 Mass. App. Ct. at 712, quoting Commonwealth v. Forte, 469 Mass. 469,477 (2014). Factors relevant to the "good reason" analysis include the nature of the crime, the concern for public safety, the need for efficient police investigation in the immediate aftermath of a crime, and the
 
                                                            -4-
 
usefulness of prompt confirmation of the accuracy of the investigatory information. Commonwealth v. Austin, 421 Mass. 357, 362 (1995).
            The nature of the crime in the present case involved the murder of I3arkon with a firearm, which had not been recovered.  The perpetrator remained at large.  The circumstances here differ, however , from a show-up identification occurring relatively close in time to the commission of a crime. In such a situation, police may conduct a show-up identification to ascertain whether or not they have apprehended the perpetrator and because a prompt identification is more likely to be accurate when the events arc still fresh in the witness's mind. Sec, e.g., Dew, 478 Mass. at 308 (show-up identification within 30 minutes of armed robbery deemed lawful); Commonwealth v. Bresilla, 470 Mass. 422, 434-435 (20 I 5) (noting it is "difficult to imagine" a scenario presenting a more compelling reason to conduct a show-up identification where suspect in homicide case roughly matching description given by witnesses located by police within an hour); German, 483 Mass. at 558 (upholding simultaneous show-up identification of two witnesses minutes after armed robbery). Exigent circumstances or " special circumstances " are not a prerequisite, however, for a one-on-one identification procedure. Commonwealth v. Martin, 447 Mass. 274, 279-281 (2006).
            Here, investigators showed Chancy a single-photograph twelve days after the murder. The need for prompt affirmation of the accuracy of the information gathered by detectives had abated. The Commonwealth nevertheless argues that "good reason" existed for conducting the single-photo identification procedure because of Chaney's prior personal familiarity with Oliver, citing Commonwealth v. Crayton , 470 Mass. 228 (2014) , in support of its position. Oliver too relics on Crayton, arguing that the identification procedure employed in the present case is analogous to a highly suggestive in-court identification of him, which requires suppression.
 
                                                            -5-
 
            In Crayton, the SJC concluded that an " in-court identification is comparable in its suggestiveness to a showup identification." 470 Mass. at 236. The court explained that, "[w]here an eyewitness has not participated before trial in an identification procedure, we shall treat the in-court identification as an in-court showup, and shall admit it in evidence only where there is 'good reason' for its admission." Id. at 241-242. The court in Crayton further noted , "there may be ' good reason' for the first identification procedure to be an in-court showup where the eyewitness was familiar with the defendant before the commission of the crime .. .." Id. at 242. Sec also Mass. G. Evid. § 1112(c)(2)(A).
            The "good reason" analysis "cannot be generalized," and "[e]ach case must be resolved on its own peculiar facts." Austin, 421 Mass. at 362. "In determining whether the police procedures rendered the identification unnecessarily suggestive, the motion judge [is] required to examine 'the totality of the circumstances attending the confrontation."' German, 483 Mass. at 558-559, quoting Commonwealth v. Odware, 429 Mass. 231, 235 (1999). Here, Chancy was very familiar with the defendant. She initially met Oliver, who she knew as "Maly," approximately one to two years before the shooting while hanging around with him and others in the neighborhood. They developed a friendship. Sec Ex. 3 at *11 (grand jury testimony of Chancy). A neophyte hairstylist at the time, Chancy began cutting, blow-drying, and braiding Oliver's hair shortly after meeting him. She styled the defendant's hair on a near biweekly basis at her home with a break at some point in time.[3] Oliver would text Chancy to schedule an appointment. Each appointment lasted more than two hours. During these hair-styling sessions, Chancy and Oliver would talk and listen to music. The defendant consistently kept up with his hair styling. Chancy described Oliver as one of three customers who " religiously" kept his
 
--------------------------------------------
 
[3] Before the grand jury, Chancy estimated that she had cut and braided the defendant's hair ten to twenty, or ten to fifteen, times.
 
                                                            -6-
 
appointments with her. The two also socialized. Before the grand jury, Chaney elaborated that she and Oliver were flirtatious with one another and that the two would hang out al her house and "watch TV or some regular stuff." Ex. 3 at *8-9. On one occasion, Chancy and Oliver went together alone to the movies. Chaney also met Oliver's family once. The defendant's contact information was stored in Chaney's cellphone under the name "Maly" followed by a heart and a teddy bear emoji. See Ex. 1. Zingg opined that the use of such symbols indicated more than a casual relationship with someone.[4] On the date of the shooting, Oliver texted Chaney regarding his hair styling appointment that day. Chancy readied her grooming equipment, and she went outside her home after the defendant had arrived and before the victim was shot.
            " Eyewitness identification of a person whom the witness had never seen before the crime or other incident presents a substantial risk of misidentification and increases the chance of a conviction of an innocent defendant." Commonwealth v. Jones, 423 Mass. 99, 109 (1996) (emphasis added). This is not such a case. Cf. Commonwealth v. Carr, 464 Mass. 855, 858, 874, 877 (2013) (in-court identifications not impermissibly suggestive where eyewitnesses had known defendant from neighborhood prior to murder) ; Commonwealth v. Cong Due Le, 444 Mass. 431, 443 & n.9 (2005) (in-court identifications not impermissibly suggestive where witness knew defendants and identification was not issue at trial). See also Commonwealth v. Vasquez, 482 Mass. 850, 858-859 (2019) (identification made from videotape containing only one individual analogous to one-on-one identification, but when no percipient witness to shooting and victim ' s family members were in a position to ascertain identity of the shooter from
 
--------------------------------------------
 
[4] That Chaney did not know Maly' s full name or where he resided docs not per se call into question her veracity and the credibility of her identification. Nor docs her evasiveness in cooperating with law enforcement early in the investigation. The court observed Chaney's demeanor during the hearing. She is a young adult  who, on the one hand, had a longtime friend murdered outside her home, while, on the other, she had to testify in court against her friend and former client. Her initial reluctance to cooperate with police , while unfortunate, is at least understandable. In any event, the defense is free to cross-examine Chancy regarding these topics.
 
                                                            -7-
 
surveillance footage, police had " good reason" to have those witnesses attempt to do so). Oliver nevertheless assails the government's failure to assemble and use "a double-blind photographic identification procedure" twelve days after the shooting. However, the "[f]ailure of the police to pursue alternate identification procedures does not in itself render an identification procedure unduly suggestive. The question is whether the police acted permissibly." Martin , 447 Mass. at 280. Sec also Grasso, Suppression Matters, § 19-7(b) (2022 Ed.).
            Here, investigators acted permissibly when they sought to confirm that the individual depicted in the photograph was the same person Chancy knew to be " Maly," with whom she had familiarity through a personal relationship spanning one to two years. Chancy neither saw Oliver in possession of a firearm nor did she sec the defendant shoot the victim. The single- photograph show-up identification by Chancy, in the peculiar circumstances of this case, confirmed that "Maly" is the person with whom she was personally familiar and "whose conduct is at issue rather than as identification evidence." Crayton, 470 Mass. at 242 243 , citing People v. Rodriguez, 79 N.Y.2d 445, 449-450 & n.* (1992). [5] The failure in these circumstances to use a "double blind" identification procedure did not make the single-photo identification "so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny the defendant due process of law. " Dew, 478 Mass. a 306-307.
            The cases cited by Oliver in support of his motion, as the Commonwealth observes in its memorandum in opposition at pages 7-8, with one exception, involve identifications by
 
--------------------------------------------
 
[5] In Rodriguez, the New York Court of Appeals explained , "[in] cases ... in which the protagonists are known to one another, suggestive ness is not a concern, hence, docs not come into play ... When a crime has been committed by a family member, former friend or long-time acquaintance of a witness there is little or no risk that comment s by the police, however suggestive, will lead the witness to identify the wrong person ... A court's invocation of the 'confirmatory identification' exception is thus tantamount to a conclusion that , as a matter of law, the witness is so familiar with the defendant that there is 'little or no risk' that police suggest ion could lead to a mis identification ... In effect, it is a ruling that however suggestive or unfair the identification procedure might be, there is virtu ally no possibility that the witness could misidentify the defendant." Rodriguez, 79 N.Y.S.2d 445, 449-450 (emphasis original).
 
                                                            -4-
 
eyewitnesses to the crime who had no prior involvement with the defendant. The one exception, Commonwealth v. Carlson, 92 Mass. App. Ct. 710, 712 (2018), is distinguishable from the present case. In Carlson, a pawnbroker identified the defendant from a single photograph as the man who some days earlier had pawned stolen jewelry as collateral for a loan. The pawnbroker told police that this male was someone with "whom [the pawnbroker] had previously dealt at a different store[.]" 92 Mass. App. Ct. at 711. The pawnbroker asked the detective whether he (the detective) had a picture of the suspect, and the detective in turn showed this witness a single photograph depicting the defendant, which the pawnbroker identified as the person seeking to pawn the stolen jewelry. Id. at 711-712.
            Citing the factors set forth in Austin, the Appeals Court in Carlson concluded there was no good reason to conduct the single-photograph identification in the circumstances of that case. Id. at 713-714. Unlike the present case, which involves the offense of murder as opposed to larceny, there was no personal-relationship familiarity in Carlson between the witness and the person identified from the photograph; rather, the witness stated that he knew the defendant simply from having dealt with him at a different store. Id. at 711. The court in Carlson cited no evidence in the record regarding the type, frequency, or duration of the interactions between the pawnbroker and the defendant, nor was there any mention of the period of time over which the pawnbroker's observations of the defendant occurred. The circumstances surrounding Chancy' s identification of Oliver as Maly arc very different.
            Oliver next argues that "special elements of unfairness" surrounded Chaney ' s single- photo identification of him and that investigators sought to "stack the deck against him" because Chancy knew Maly was both a suspect in the homicide investigation and the subject of the grand jury proceedings when Zingg presented her with the photograph and, therefore, she was
 
                                                            -9-
 
pressured to confirm the investigators ' belief that the man in the picture committed the murder, rather than rely on her own independent memory of the incident.
            "Under art. 12, '[e]ven where there is a good reason to conduct a one-on-one identification procedure, the evidence must be excluded if there arc special elements of unfairness, indicating a desire on the part of the police to stack the deck against the defendant."' German, 483 Mass. at 559.  Sec Commonwealth  v. Leaster, 395  Mass. 96, 103  (1985) (even where showup occurs promptly after crime, " if there arc special elements of  unfairness, indicating a desire on the part of the police to ' stack the deck' against the defendant, an
identification resulting from such a confrontation would be inadmissible" ); Commonwealth v. Moon, 380 Mass. 751, 756- 759 (1980) (identification procedure unnecessarily suggestive where police suggested name of defendant to victim and then showed him single photograph that police removed from vehicle that eyewitness thought belonged to assailant). The court in this case carefully examines the circumstance surrounding the investigators' use of a single-photo identification procedure to determine whether there arc "special elements of un fairness."
            On August 24, 2022, prior to testifying before the grand jury, Chancy met with the assistant district attorney and two police officers, one of whom was Zingg, while accompanied by a victim witness advocate. The meeting lasted at least 30 minutes and possibly more than one hour. Chancy knew Maly was a suspect in the murder investigation at that time.  Zingg explained to Chaney the function of the grand jury, described who would be present during her testimony (that there would be no judge or defense attorney), and told her that "all she needs to do is tell the truth. " Investigators also reviewed with Chancy the substance of her expected testimony. This is a common practice of police and prosecutors.
 
                                                            -10-
 
            Investigators asked Chaney how she knew Maly and what occurred on the date of the shooting. Chancy could not recall whether these questions were asked of her before the photograph depicting Oliver, a/k/a Maly, was shown to her, but Zingg recalled asking Chancy about her knowledge of, and relationship with, Maly before showing her the photograph of the defendant. Upon showing Chaney the photograph, Zingg asked in substance , " Ca n you identify this person?" Zingg showed Chaney the photograph of the person believed to be Maly " to solidify that we were talking about one in the same person." Zingg did not employ a photo-array identification procedure because Chaney had known Maly for a significant period of time and had more than a casual relationship with Maly. For her part, Chaney was traumatized by the event in which someone she grew up with (Barkon) was shot and killed. She found the " whole situation itself stress ful," but she did not feel pressured by the police or their questioning of her. The evidence presented at the hearing docs not demonstrate special elements of unfairness indicating a desire to stack the deck against Oliver in showing Chancy the single photograph of the defendant.
            Oliver also challenges the failure to instruct Chancy on the protocol adopted in Silva- Santiago prior to showing her the defendant's photograph. In German, the SJC announced that, going forward, it would require the police to provide witnesses with the following instruction prior to a show-up identification:
You are going to be asked to view a person; the alleged wrongdoer may or may not be the person you are about to view; it is just as important to clear an innocent person from suspicion as it is to identify the wrongdoer; regardless of whether you identify someone , we will continue to investigate; if you identify someone, I will ask you to state, in your own words, how certain you arc.
483 Mass. at 464-465.
 
                                                            -11-
 
            German became effective on December 11, 2019, and the single-photo identification in this case occurred on August 22, 2022. The pre-identification instruction should have been given. "The failure to instruct a witness prior to a showup identification will carry the same consequences as a failure to follow the Silva-Santiago protocols." German, 483 Mass. at 564- 565, citing Commonwealth v. Thomas, 476 Mass. 451,459 (2017). In Thomas , the SJC concluded that "the consequence of a failure to follow the Silva-Santiago protocol is twofold: it affects a judge's evaluation of the admissibility of the identification; and, where it is found admissible, it affects the judge's instructions to the jury regarding their evaluation of the accuracy of the identification." 476 Mass. at 459. In addressing the admissibility of the identification and assessing whether Chaney's identification was so unnecessarily suggestive and conductive to irreparable mistaken identification as to deny Oliver clue process of law, this court must carefully evaluate "the totality of the circumstances regarding the interaction between the witness and the police." Id. at 460. The Court in Thomas noted that the failure to follow the Silva-Santiago protocol needlessly increases the risk of misidentification but that, alone, it docs not require suppression of the identification. Id. The SJC explained,
In considering the degree of suggestiveness arising from the failure to follow the protocol, a judge may consider the witness's familiarity with the alleged wrongdoer. The level of familiarity between a witness and the suspect is measured by factors such as the number of times the witness viewed the suspect previously; the duration , nature, and setting of those encounters; and the period of time over which the encounters occurred ...
Id. (emphasis original).
            Based on the credible evidence set forth in detail above, this court concludes that, where Chancy knew Maly from extended prior personal interactions, the risk of misidentification arising from the failure to follow the Silva-Santiago protocol is considerably less than where a witness views a single photograph of an unknown person she/he saw only briefly during the
 
                                                            -12-
 
commission of the crime. Suppression of the identification for failure to instruct Chancy in accordance with Silva-Santiago and German is not required in the specific circumstances of this case. The trial judge may instruct the jury regarding the reliability and accuracy of Chaney's identification.
CONCLUSION AND ORDER
            For the reasons set forth above, Oliver has failed to demonstrate by a preponderance of the evidence that the identification procedure employed by the police and the prosecution was so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny him due process of law, or that there were special elements of unfairness indicating a desire on the part of the Commonwealth to stack the deck against him.
            The Defendant's Motion to Suppress Identification (Paper No. 65) therefore is DENIED.